**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

TONETTE STATON,

> Plaintiff,

v.                                                    ACTION NO. 2:13cv572

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

> Defendant.

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72(b) of the Federal Rules of Civil Procedure, as well as Rule 72 of the Rules of the United States District Court for the Eastern District of Virginia.

Plaintiff Tonette Staton ("Ms. Staton" or "Plaintiff") brought this action pro se under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act. The undersigned recommends that the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI on June 3, 2010, alleging disability since January 1, 1999, caused by diabetes, learning disability, anxiety, high cholesterol, diabetic neuropathy, and

hypertension. Tr. 151-61, 227, 232.[1] Plaintiff was last insured for DIB purposes in June 2012. Tr. 227. Her claim for DIB was denied, as was her claim for reconsideration. Tr. 51-72, 75-96. ALJ Irving Pianin held an administrative hearing on March 15, 2012. Tr. 28-50. At this hearing, Plaintiff amended her alleged onset date to August 2010, because she had worked up until that point. Tr. 31. The ALJ issued a decision on May 22, 2012, finding Plaintiff not disabled. Tr. 11-22. Plaintiff appealed, and the Appeals Council denied review of the ALJ's decision. Tr. 1-7. The ALJ's decision therefore stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481 (2012).

Plaintiff filed a Motion for Leave to Proceed in Forma Pauperis on October 21, 2013, (ECF No. 1), which was granted on October 22, 2013 (ECF No. 2). Plaintiff filed her Complaint on October 22, 2013, and after a Motion for Extension of Time (ECF No. 6) was granted (ECF No. 7) the Commissioner filed her Answer on January 1, 2014 (ECF No. 8). The Commissioner filed a Motion to Dismiss for Lack of Prosecution on March 10, 2014 (ECF No. 13), along with a memorandum in support (ECF No. 14). This Court ordered Plaintiff to show cause why the Complaint should not be dismissed for failure to prosecute, along with a Motion for Summary Judgment with memorandum supporting her contentions and containing a statement of undisputed facts. ECF No. 16.

Plaintiff filed a response to the order to show cause on April 22, 2014 (ECF No. 18), and this Court construed that letter as Plaintiff's motion for summary judgment (ECF No. 19). This Court therefore recommends that the Commissioner's Motion to Dismiss for Lack of Prosecution (ECF No. 13) be DISMISSED as moot.

Commissioner filed a motion for summary judgment on May 28, 2014 (ECF No. 20) and

---

[1] The citations in this Report and Recommendation are to the Administrative Record.

a memorandum in support (ECF No. 21).  Plaintiff filed a reply on July 1, 2014.  ECF No. 25.

## II. FACTUAL BACKGROUND

Born in 1969, Ms. Staton was twenty-nine years old on her alleged onset date of January 1, 1999, forty years old at the time of her amended alleged onset date of August 2010, and forty-two years old at the time of her administrative hearing and the ALJ's decision. Tr. 28, 151.

Ms. Staton completed high school in 1988. Tr. 33. Between September 2000 and May 2006, Plaintiff worked in the laundry department of Sentara Nursing Home. Tr. 165. She worked for eight hours a day, five days a week, and earned $7.47 per hour. Tr. 165. Besides this, Plaintiff's work history is sporadic, with work as a housekeeper, custodian, warehouse worker, receptionist and cashier. Tr. 33, 48, 165, 218-19, 232-33. Plaintiff last worked in housekeeping in May 2010, and has not looked for a job since then. Tr. 35, 233.

### A.      Medical Background

When she was nine years old, Plaintiff received a borderline mentally retarded classification from Cooke Elementary School. Tr. 365. In junior high, Plaintiff was involved in special education for the educable mentally retarded, and with mainstreaming she returned to regular class programs. Tr. 365. In 1986, results from the Weschler Intelligence Scale for Children-Revised showed that Plaintiff's verbal, performance, and full scale IQ fell within the borderline intellectual functioning range.[2] Tr. 365-66.

In December 2009, Plaintiff was seen at Virginia Beach Family Medical Center (VBMC) for diabetes, irregular menses, and anxiety. Tr. 426. Plaintiff reported a history of alcohol and tobacco use, and was described as non-compliant in her diabetes treatment medication, exercise, diet, and home glucose monitoring. Tr. 426. Plaintiff reported diabetic neuropathy and moderate

_____

[2] Plaintiff did not receive any mental health treatment during the relevant time period. Tr. 39.

paresthesias in her feet and hands, and was non-compliant with her hypertension medication. Tr. 426. She was assessed with Type II diabetes, hypertension, and abdominal pain by Lauren N. Gillis, ANP, a nurse practitioner. Ms. Gillis prescribed Metformin, Glyburide, and Humulin (insulin) injections for diabetes, and Lisinopril and Hydrochlorothiazide for hypertension. Tr. 427.

In January 2010, Plaintiff returned to VBMC and reported intermittent abdominal pain over the prior two years, and cramping—with no relation to food but connected to when she had to talk in front of people. Tr. 425. She had complied with her hypertension medication, and it was controlled with no side effects. Tr. 424. Her diabetes was uncontrolled but stable, and she denied monitoring her glucose levels at home, and paresthesias or other diabetic complications. Tr. 424. Plaintiff continued to smoke, and reported moderate alcohol usage—her social history detailed consumption of a case of beer per night, though sometimes a case would last up to four days. Tr. 424. Plaintiff's examination revealed that her abdomen was non-tender, non-distended, and she was diagnosed with anxiety. Tr. 424-25. Ms. Gillis continued Plaintiff's diabetes and hypertension medications, and prescribed Hydroxyzine. Tr.424-25. In June 2010, Ms. Gillis refilled Plaintiff's prescriptions. Tr. 521.

In October 2010,[3] Plaintiff again visited VBMC and her diabetes was considered uncontrolled, but she had no paresthesias, hypoglycemic episodes, or other diabetes complications. Tr. 519. She had not been compliant with her diabetes treatment, and Ms. Gillis continued Plaintiff's medications. Tr. 519-20.

In November 2010, a psychologist named Janet L'Abbe, Ph.D. performed a one-time consultative mental status evaluation of Plaintiff. Tr. 437-40. Plaintiff arrived early to the

---

[3] This is the first medical record after Plaintiff's amended alleged onset date of August 13, 2010.

examination, was unaccompanied, appropriately attired, and adequately groomed. Tr. 437. She ambulated without aid of device or apparent difficulty, displaying no pain behaviors. Tr. 437. Plaintiff reported initial insomnia, tension headaches, free-floating anxiety, and panic attacks— happening approximately twice a week, when around a lot of people—that made her body painful, heart race, and back tremble. Tr. 438. Plaintiff was guarded but made efforts to cooperate, presented with blunted affect and anxious mood, and produced spontaneous speech with impoverished vocabulary. Tr. 438. Plaintiff appeared fully oriented, had linear and concrete thought process, with content negative for delusional or hallucinatory episodes. Tr. 438. Dr. L'Abbe diagnosed Plaintiff with generalized anxiety disorder and alcohol abuse in sustained full remission. Tr. 439. She assigned Plaintiff a global assessment of functioning (GAF) score of 55, described as moderate symptoms or functional limitations. Tr. 439.

Dr. L'Abbe assessed that Plaintiff would probably be unable to perform above a moderate level of task at this time, but regular attendance at work would not likely be problematic. Tr. 439. Plaintiff's ability to consistently perform work related activities would probably be affected by her level of anxiety, and her ability to deal with stressors from the competitive workforce was likely compromised at the time. Tr. 439. Plaintiff was not currently being treated for anxiety, but with treatment, had a good prognosis. Tr. 439.

In December 2010, David Deaver, Ph.D., reviewed Plaintiff's records. Tr. 57-59. He found she was "not significantly limited" in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; sustain an ordinary routine without special supervision; make simple work-related decisions, or; complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a constant pace without an unreasonable number and length of rest periods. Tr. 58. He

found her "moderately limited" in her ability to: carry out very short and simple instructions; carry out detailed instructions, maintain attention and concentration for extended periods, and; work in coordination with or in proximity with others without being distracted by them. Tr. 58. In terms of social interactions, she was "moderately limited" in her ability to interact appropriately with the general public, and her ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 58.

In January 2011, Plaintiff saw Ms. Gillis at VBMC and admitted to being completely noncompliant, stating that she had not taken any diabetes medication since October 2010, and not even gotten her prescriptions filled from the October visit. Tr. 516-17. She reported fainting twice in the last month, unwitnessed and with amnesia after the event. Tr. 516. She did not seek medical care, but stated she was very forgetful and confused easily by friends and family.  Tr. 516.  Plaintiff reported diabetic neuropathy, polyuria, moderate fatigue, and chronic paresthesias in her hands and feet. Tr. 516. Ms. Gillis continued Plaintiff on Metformin, Glyburide, Humulin injections, and Lovastatin. Tr. 517.

In February 2011, Plaintiff went to Sentra Virginia Beach General Hospital ("Virginia Beach General") with burning pain in her feet, and pain in her back and abdomen. Tr. 456.  She did not have any acute changes, fever, or chills. Tr. 456. Plaintiff had a normal gait, normal range of motion in her neck, normal muscle tone, coordination, and reflexes, good distal pulses, no ulcerations, no edema, and no tenderness in her abdomen. Tr. 454, 457-58.  No evidence was found of acute abnormality or diabetic foot ulcer, but a small area of fungal irritation was on her left foot. Tr. 455, 458. Plaintiff was diagnosed with diabetic peripheral neuropathy, a small area of tinea pedis, hyperglycemia, and uncontrolled diabetes. Tr. 453.

In June 2011, Plaintiff went to VBMC and saw Pauline Reed, M.D., because she had

been passing out and could not remember things. Tr. 513. Plaintiff stated that she had two episodes since her previous visit, had not convulsed, but had gone to the ER. Tr. 513. Her blood sugar was high, she had not been compliant with her home glucose monitoring, and Dr. Reed again reported her diabetes as uncontrolled. Tr. 513. An examination showed her to be alert and oriented, with no edema and normal peripheral pulses. Tr. 513. Dr. Reed refilled Plaintiff's prescriptions and requested her ER records. Tr. 513-14.

In August 2011, Plaintiff had a follow-up appointment with Ms. Gillis, who recorded that Plaintiff's diabetes was uncontrolled, and that she was not compliant with her recommended diet. Tr. 511. Plaintiff reported no paresthesias or other diabetic complications, had no edema, and normal peripheral pulses. Tr. 511. Ms. Gillis continued Plaintiff's Metformin and Lovastatin, increased Plaintiff's dosage of Humulin, and added a NovoLog solution and Neurontin for diabetic neuropathy. Tr. 512. Ms. Gillis also prescribed Hydroxyzine for a second time, for Plaintiff's anxiety. Tr. 512.

In September 2011, Plaintiff went to VBMC with her diabetes still uncontrolled, no recent medical change, and continued noncompliance with exercise and diet—Plaintiff admitted to eating fast food and drinking alcohol. Tr. 509. Ms. Gillis continued Plaintiff's medications and increased the dosage of her Humulin injections. Tr. 509.

In October 2011, Ms. Gillis found Plaintiff's diabetes to still be uncontrolled, and that she was also not compliant with her diabetes treatment. Tr. 507. Plaintiff reported constant paresthesias in her hands, but no edema, and normal peripheral pulses. Tr. 507. Ms. Gillis again increased Plaintiff's Humulin dosage and continued the rest of her medications. Tr. 507-08.

In December 2011, a follow-up appointment at VBMC showed Plaintiff's diabetes to be uncontrolled, and she continued to be non-compliant with her diabetes treatment. Tr. 503. Ms.

7

Gillis continued her diabetes medications and again increased the dosage of her Humulin injections. Tr. 503.

In January 2012, Plaintiff reported to VBMC with paresthesias in her hands, wrists, legs, and feet, but no change in her sugar level following the recent medication change. Tr. 505. Plaintiff was not complying with her diabetes treatment, and Ms. Gillis made no changes to Plaintiff's medications. Tr. 505.

In August 2011, Plaintiff came to Virginia Beach General with a fractured humerus, after she was assaulted by a male friend. Tr. 484-85. Plaintiff initially said that her friend poured alcohol on her, but later admitted to drinking alcohol prior to going to the hospital. Tr. 484-85. Plaintiff was hyperglycemic, and non-compliant with her medication regimen. Tr. 485. She was splinted, with a sling applied. Tr. 485.

**B.      The Administrative Hearing**

Plaintiff had a hearing before ALJ Irving Pianin on March 15, 2012. Tr. 28-50. Plaintiff was represented at that time, and testified that she lived with her brother and her twenty-one year old niece. Tr. 32-33. She said she spent her days sleeping, but also helped wash the dishes and took care of her personal needs. Tr. 43-44. She said she did not cook, do her own laundry, or drive. Tr. 43-44. She went food shopping with her brother, watched television, and talked on the phone. Tr. 44. She could lift twenty-five pounds. Tr. 46. Plaintiff stated she had friends, but did not go to see them. Tr. 44. Plaintiff testified at the hearing that she stopped drinking alcohol in 2009. Tr. 36-37.

Some of this testimony is inconsistent with other reports, as Plaintiff told her doctors that she was drinking as late as August 2011. Tr. 485, 509. Also, in her function report from June 2010, she stated that she vacuumed, did the laundry, shopped for food and clothes, and

sometimes went out alone. Tr. 250-53.

### C.    The ALJ's Decision – May 22, 2012

After reviewing the entire record, the ALJ followed the five-step analysis laid out in 20 C.F.R. § 404.1520. *See infra* p. 12. At step one he found that the Plaintiff had not engaged in substantial gainful activity since August 13, 2010, the amended alleged onset date.  Tr. 13. At step two, the ALJ found that the Plaintiff had the following severe impairments: diabetes mellitus, peripheral neuropathy, borderline intellectual functioning, anxiety, hypertension, and alcohol abuse.[4] Tr. 13.

The ALJ found at step three that Plaintiff's impairments, alone or in combination, did not meet or medically equal the severity of one of the listed impairments. Tr. 14.

At step four, the ALJ determined that Plaintiff could not perform any of her past relevant work. Tr. 20. The ALJ considered Plaintiff's Residual Functional Capacity ("RFC"), age, education, and work experience. Tr. 21.

At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform.  Tr. 21.  The ALJ cited the opinion of Ms. Augins, the vocational expert, that Plaintiff could perform light/unskilled occupations such as labeler—for which there are 800 positions in the local economy, and 287,000 positions in the national economy—and dining room attendant, of which there are 1500 existing positions in the local economy, and 430,000 positions in the national economy. Tr. 21. The ALJ therefore found

---

[4] The ALJ's RFC findings gave the Plaintiff "the benefit of every doubt regarding the severity of her symptoms because the record documents persistent noncompliance with medications and diet, a failure to remain abstinent from the use of alcohol, and a failure to seek and obtain psychological or psychiatric treatment. These behaviors all aggravate the symptoms of the impairment."  Tr. 20; *but see* 20 C.F.R. § 404.1530 ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled.").

that Plaintiff was not disabled. Tr. 22.

### D.    Subsequent Medical History

After the ALJ's decision, Plaintiff continued treatment at Sentara Princess Anne Hospital ("Princess Anne"). ECF No. 18-1. In September 2012, Plaintiff was diagnosed with chronic joint pain and diabetic neuropathy, and continued on Norco, Neurontin, Hydrochlorothiazine, Humulin, Lisnopril, and Metformin. ECF No. 18-1 at 6-9.

In April 2013, Plaintiff returned to Princess Anne for foot pain, a shoulder sprain, and gout. ECF No. 18-1 at 10-16. Plaintiff was prescribed Norco and Indocin. ECF No. 18-1 at 15-16.

On August 1, 2013, Plaintiff came to Princess Anne and was diagnosed with uncontrolled diabetes, vertigo, and pain in her right arm. ECF No. 18-1 at 17, 21. She was prescribed Motrin, Antivert, and Valium. ECF No. 18-1 at 20. On August 6, 2013, she returned with a headache and neck pain, and was given Percocet. ECF No. 18-1 at 1-5, 28.

In January 2014, she was seen at Princess Anne for muscle pain, and was prescribed Flexeril and Motrin. ECF No. 18-1 at 24, 26-27.

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g) (2012); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison*

*Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the [Secretary's] designate, the ALJ)." *Craig*, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Perales*, 402 U.S. at 390; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## IV. <u>ANALYSIS</u>

To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act.  The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); *see also* 42 U.S.C. §§ 423(d)(1)(A) and

11

416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.

In evaluating disability claims, the regulations promulgated by the Social Security Administration provide that all material facts will be considered to determine whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals a condition contained within the Social Security Administration's official listing of impairments, (4) has an impairment that prevents her from past relevant work, and (5) has an impairment that prevents her from any substantial gainful employment. An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability. This analysis is set forth in 20 C.F.R. § 404.1520.

Despite the specific Order (ECF No. 16), Plaintiff did not provide a set of undisputed facts. Plaintiff argues that her complete medical history was not adequately reviewed, and repeats that she is not capable of working. ECF No. 1.

1.      **The ALJ's decision is Substantially Supported by the Record**

The ALJ properly determined Plaintiff's RFC. Tr. 16-17.  The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC. 20 C.F.R. § 404.1545(a). The RFC is a claimant's maximum ability to work despite her limitations. *Id.* § 404.1545(a)(1). The determination of RFC is based on a consideration of all the relevant

medical and other evidence in the record.  20 C.F.R. § 404.1545(a)(3).[5]

The ALJ found that Plaintiff retained the RFC to perform a limited range of light work, except she can have only occasional in-person contact with co-workers, supervisors, and/or the general public, due to limitations in social functioning. Tr. 16-17. He also found Plaintiff had the ability to perform only simple, routine, repetitive one or two step tasks due to limitations in concentration, persistence, or pace. Tr. 16-17.

To reach this determination the ALJ must engage in the two-step inquiry detailed in 20 C.F.R. § 404.1529: (1) whether an underlying medically determinable physical impairment can be shown that could reasonably be expected to produce the claimant's pain or other symptoms, (2) if so, the extent to which they limit the Plaintiff's functioning, based on their intensity, persistence, and limiting effects. *See Craig*, 76 F.3d at 594-95. In that analysis, the ALJ stated,

> Ms. Staton alleges an inability to work due to pain, fatigue, anxiety and impaired intellectual functioning. The evidence establishes the existence of medically determinable impairments that can reasonably be expected to result in the types of symptoms the claimant reports but the record does not support the degree of limitation she alleges. . . . The [Plaintiff's] complaints of "disabling" pain, neuropathy, fatigue, anxiety and impaired intellectual functioning are not supported by the objective findings from physical examinations, by the conservative course of treatment she has required, by her work history by the report of the evaluating psychologist, by her alcohol abuse or by her noncompliant behavior.

Tr. at 17, 20.

In reaching this determination, the ALJ considered that Plaintiff had a long history of diabetes and related neuropathy, predating the relevant period, during which Plaintiff worked. Tr. 18, 424, 427, 521. Further, Plaintiff's primary treatment consisted of conservative medication

---

[5] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. §  404.1529(a).

management from VBMC, with no negative side effects documented. Tr. 18-19. This is supported by the records from VBMC on December 2009 (Tr. 426), January 2010 (Tr. 425), October 2010 (Tr. 519-20), January 2011 (Tr. 516), June 2011, (Tr. 513), August 2011 (Tr. 511), September 2011 (Tr. 509), October 2011 (Tr. 507), December 2011 (Tr. 503), and January 2012 (Tr. 505). Plaintiff's hypertension was also reported to be controlled by medication in January 2010. Tr. 424.

The ALJ noted that Plaintiff's diabetes was uncontrolled, but Plaintiff did not comply with the recommended medication, exercise, diet, or home monitoring of her blood sugar. Tr. 18-19. The records from VBMC directly demonstrated her strict noncompliance—in every single visit to VBMC, she was reported to have been noncompliant in her diabetes treatment: December 2009, January and October 2010, January, June, August, September, October, and December of 2011, and January 2012. Tr. 425, 426, 503, 505, 507, 509, 511, 513, 516, 519. Her visit to Virginia Beach General in August 2011 also demonstrated alcohol consumption and non-compliance. Tr. 485.

The ALJ found that "the objective findings of normal peripheral pulse and lack of edema in her extremities were not consistent with the severe neuropathy and pain she reported." Tr. 19. Records from Plaintiff's visits to VBMC in January 2010, and June, August, and October 2011 directly support this conclusion, with no edema or clubbing in extremities, and normal peripheral pulse. Tr. 424, 457-58, 507, 511, 513. Plaintiff's visit to the Virginia Beach General also supports the ALJ's claim, as Plaintiff had a steady gait without difficulty, normal range of motion, normal muscle tone, normal reflexes, no ulcerations, no edema, and no tenderness. Tr. 19, 454, 457-58. Further, Plaintiff denied paresthesias on multiple occasions. Tr. 424, 511, 519.

As far as psychological impairments, the ALJ stated, "the evidence related to the

claimant's impaired intellectual functioning confirms that she has a history of special education services and borderline intellectual functioning but her work history shows that she has been able to perform simple work activities at a level that is consistent with substantial gainful activity."

Tr. 18-19. Plaintiff's work for six years in the laundry department of Sentara Nursing Home supports this claim—she spent eight hours a day, five days a week. Tr. 18, 165. This finding is also supported by the earlier test results—the Weschler Intelligence Scale for Children-Revised—showing Plaintiff's verbal, performance, and full scale IQ to be within the borderline intellectual functioning range. Tr. 365-66. This is further supported by the fact that Plaintiff only complained of anxiety and mental health issues on a couple of occasions, and was only twice prescribed medicine for anxiety during the relevant period, in December 2009 and August 2011. Tr. 18-19, 425, 512.

The ALJ evaluated that Plaintiff was "able to interact appropriately with her family and with her medical providers," which is supported by her testimony from her hearing and unaccompanied visit to Dr. L'Abbe.  Tr. 18, 43-44, 46, 250-53, 437.

The ALJ's determination that Plaintiff has borderline intellectual functioning but is able to perform simple work activities is supported by the record from Dr. L'Abbe. Tr. 18. Dr. L'Abbe stated that Plaintiff's "ability to perform work activities consistently would likely be affected by the level of anxiety. Her ability to deal with stressors from the competitive workforce is likely compromised at this time" Tr. 439. Dr. L'Abbe noted Plaintiff could not do "above a moderate level of task at this time," but stated that Plaintiff's prognosis remained "good," and she could, with successful treatment, likely return to the workforce. Tr. 439. She assigned Plaintiff a GAF score of 55, and found that regular attendance at a job would not likely be problematic. Tr. 439.

The ALJ also noted the opinions of two DDS medical consultants, giving minimal weight to their conclusions that the claimant does not have a "severe" physical impairment. Tr. 20.  He gave significant weight to their opinions that the Plaintiff's mental impairments cause "moderate" weight in social functioning and concentration, persistence or pace. Tr. 20. This determination was supported by Plaintiff's conservative course of treatment, minimal diagnoses or medications for mental issues, and by the overall findings of the evaluating psychologist, Dr. L'Abbe. Tr. 20, 425, 437, 512.

The ALJ gave minimal weight to Dr. L'Abbe's specific conclusion that claimant was unable to handle the stress of a competitive work environment, because her opinion was based on one examination and not supported by medical treatment records. Tr. 20. The ALJ concluded from this that "the [Plaintiff's] ability to work for almost six years as a laundry worker is not consistent with impaired intellectual functioning that prevents all work or with anxiety that precludes all social contact." Tr. 19. Plaintiff makes no argument for what has changed in her condition between her six years of consistent employment at Sentara Nursing Home, and the alleged onset of her disability. Tr. 165.

The ALJ also found that Plaintiff's inconsistent work history and "required incarceration for her DUIs" did not "support her overall credibility." Tr. 19. This finding was supported by Plaintiff's inconsistent testimony regarding her alcohol usage. At her hearing before the ALJ, Plaintiff testified that she had not used alcohol since 2009, but she admitted in September 2011 to her doctor that she had been drinking. Tr. 38-39, 509. Further, during her visit to Virginia Beach General in August 2011, she claimed a friend had poured alcohol on her, before eventually admitting to drinking alcohol prior to going to the hospital. Tr. 484-85. The ALJ

noted that Plaintiff's consumption of alcohol also undermines the credibility of her alleged uncontrolled diabetes, as alcohol elevates her blood sugar level. Tr. 19.

Based on all of this, the ALJ appropriately determined Plaintiff's RFC. Again, it is not this Court's role to re-weigh the evidence, make credibility determinations, or substitute its judgment for that of the Commissioner, but only to see if there is substantial evidence, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401; *see Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. Here, the above cited record provides substantial evidence to support the ALJ's findings, and constitutes relevant evidence that a reasonable mind might accept the ALJ's conclusion as adequately supported.

### 2.      Plaintiff's Additional Materials Should Not Be Considered

To the extent that Plaintiff claims her complete medical history was not thoroughly reviewed, Plaintiff has submitted additional material to this Court that was not before the ALJ or the Appeals Council. ECF No. 18-1. These additional documents are records from Princess Anne detailing her treatment since the ALJ's decision, and her psychological evaluation records from 1976 and 1977. ECF No.18-1 at 29-32.

This Court should not remand the case back to the Commissioner for an examination of the new evidence. Sentence six of 42 U.S.C. § 405(g) allows that "[t]he court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (2012). Any evidence to warrant a remand must be new, material, and have good cause for why it was not previously presented to the Social Security Agency. *See Shalala v. Schaefer*, 509 U.S. 292, 297 n.2 (1993). For remand under sentence six of 20 U.S.C. § 405(g), "[e]vidence is new 'if

it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (quoting *Wilkins v. Sec'y, Dep't. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). Further the evidence must relate to the relevant period on or before the date of the ALJ's decision. *Wilkins*, 953 F.2d at 96 (citing *Williams v. Sullivan*, 905 F.2d 214, 216 (8th Cir. 1990)).

This evidence Plaintiff submits is not new, because it is cumulative and duplicative.  The psychological evaluation is substantively the same information presented on the record—that Plaintiff's school history included special education, she was classified with mild retardation when she was young. Tr. 365. The records from Princess Anne are not new because they do not provide any unique objective findings; the records do not indicate any new treatment for Plaintiff's diabetes, neuropathy, or hypertension. ECF No. 18-1 at 1-28.

This additional information is not material because there is not a reasonable probability that it would have changed the outcome. Plaintiff's psychological records from when she was six do not override the more recent evaluations, and do not alter the light in which the other evidence is viewed. The records from Princess Anne do not create a reasonable probability of a different result because they do not demonstrate any significant departure from the record before the ALJ. Plaintiff's shoulder sprain, foot pain, headache, and isolated complaints of gout and vertigo do not demonstrate disability or undermine confidence in the ALJ's determination. ECF No. 18-1 at 1-28.

Finally, the additional evidence does not relate to the relevant period. The information from Princess Anne was from after the ALJ made his determination, and the school records are from thirty-five years before the alleged onset date. ECF No. 18-1 at 1-28.  Plaintiff's request that this Court remand the case for the ALJ to consider the additional material should therefore

be DENIED.

## V.  RECOMMENDATION

For the foregoing reasons, this court recommends that the Commissioner's Motion to Dismiss for Lack of Prosecution (ECF No. 13) be DISMISSED as moot. Further, there is substantial evidence to support the Commissioner's decision, so this Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 18) be DENIED; the Commissioner's Motion for Summary Judgment (ECF No. 20) be GRANTED, and; the final decision of the Commissioner be AFFIRMED. Lastly, the additional evidence submitted is not new, is not material, and was not from the relevant time period, so this Court recommends that Plaintiff's requested remand for further consideration be DENIED.

## VI.  REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(e) of said rules. A party may respond to another party's objections within ten (10) days after being served with a copy thereof.

2. A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

                                        /s/
                              Tommy E. Miller
                         United States Magistrate Judge

Norfolk, Virginia
January 7, 2015